672 So.2d 277 (1996)
Mr. and Mrs. Charles COUVILLION
v.
SHELTER MUTUAL INSURANCE COMPANY, Borden, Inc., State of Louisiana Through the Department of Transportation and Development.
No. 95 CA 1186.
Court of Appeal of Louisiana, First Circuit.
April 4, 1996.
*280 Robert E. Kleinpeter, Baton Rouge, for Mr. & Mrs. Charles Couvillion.
John F. Jakuback, Baton Rouge, for State of Louisiana Through the Department of Transportation & Development.
Thomas K. Kirkpatrick, Baton Rouge, for Borden Chemical Co.
Arthur H. Andrews, Baton Rouge, for PALA, Inc.
Ben E. Clayton, Metairie, for Aetna Casualty & Surety Co.
Before LeBLANC, WHIPPLE and FOGG, JJ.
LeBLANC, Judge.
This appeal arises from a personal injury case in which a pedestrian was struck by an automobile as he was attempting to cross a highway.
On January 22, 1985, plaintiff, Charles A. Couvillion, was employed by PALA, Inc., a contractor performing work on a turnaround at Borden chemical plant in Ascension Parish. PALA employees were required by Borden's to park their vehicles in a parking lot located across La. Hwy. 73 from the Borden plant. La. Hwy. 73 is a two-lane highway with a speed limit of 50 m.p.h. On the day of the accident, Mr. Couvillion completed his shift at approximately 5:30 a.m., exited the plant, and began walking to the parking lot. It was still dark at that time. Mr. Couvillion entered the roadway and either at or near the center-line was struck by a vehicle driven by Joseph Greaud.
Mr. Greaud indicated he was driving southbound on La. Hwy. 73 at approximately 50 m.p.h. as he approached the Borden plant. He was on his way to work and was late. He testified he suddenly saw several pedestrians in the southbound lane of traffic, one of whom was later identified as Virgil Kimble, Jr. and veered to the left to avoid them. At that point, Greaud's vehicle struck Mr. Couvillion, who was thrown up onto the windshield and over the top of the automobile. As a result, Mr. Couvillion sustained injuries to his head (including double vision), right leg, and right hand.
Mr. & Mrs. Couvillion settled with and released Mr. Greaud, the driver of the vehicle which struck Mr. Couvillion, upon payment of the limits of his liability policy. Thereafter, Mr. and Mrs. Couvillion filed suit against Borden, and the State of Louisiana, through the Department of Transportation and Development (DOTD).[1]
Borden filed a third-party demand against PALA, Mr. Couvillions' employer, seeking contractual indemnification for any amounts for which Borden was held liable to plaintiffs.
Following a bench trial, the court rendered judgment in favor of plaintiffs and against Borden for twenty percent of plaintiffs' total damages. The judgment was based on the court's apportionment of fault as follows: 15% to Virgil Kimble, Jr. (who was not a party to the suit), 20% to Borden, 25% to plaintiff, and 40% to Mr. Greaud. Plaintiffs' claims against DOTD were dismissed because DOTD was found not to be at fault. Mr. Couvillion's total damages were fixed at $343,364.90, consisting of the following awards: $30,931.90 for past medical expenses; $11,000.00 for future medical expenses; $44,565.00 for past lost wages; $11,868.00 for future lost wages; and $245,000.00 *281 for pain and suffering. Mrs. Couvillion's damages for loss of consortium were fixed at $15,000.00. Additionally, judgment was rendered on Borden's third-party demand in favor of Borden and against PALA in the amount for which Borden was cast in judgment.[2]
Plaintiffs and Borden each appealed the trial court judgment, and PALA answered the appeals. Plaintiffs allege the trial court erred: in assessing any fault to Mr. Couvillion and Mr. Greaud and, alternatively, in the amount of fault assessed to each; in assessing any fault to Mr. Kimble, a non-party "phantom tortfeasor"; in denying plaintiffs' motion for new trial; in awarding inadequate damages for loss of consortium to Mrs. Couvillion; and, in failing to award Mr. Couvillion damages for loss of earning capacity and loss of enjoyment of life. In its appeal, Borden alleges the trial court erred in finding Borden at fault, in finding DOTD free of fault, and in not allowing defendants credit for settlement funds paid to plaintiffs. In its answer, PALA contends the trial court erred in holding it must indemnify Borden.

APPORTIONMENT OF FAULT TO NON-PARTY
Plaintiffs contend the trial court committed legal error in assigning any percentage of fault to Virgil Kimble, Jr., the pedestrian who crossed La. Hwy. 73 ahead of plaintiff. We agree.
In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496, p. 7 (La. 6/30/95), 657 So.2d 975, 980, the Louisiana Supreme Court considered the language of La.C.C.P. art. 1812C(2), which permits quantification of the fault of "another person, whether party or not", if such quantification is appropriate. The Supreme Court indicated this language was intended primarily to provide for quantifying the fault of a settling tortfeasor who was never made a party to the litigation, and stated further that:
It is generally neither necessary nor appropriate to quantify the fault of other non-parties (except persons whose negligence is imputable to the plaintiff or of a defendant).
* * * * * *
[A] finding of fault against a person not a party to the action is not binding on that person, and the plaintiff cannot recover against that person nor can the defendants obtain contribution from that person. Because of these considerations, juries should not be required to quantify the fault of a person that no party sees fit to join in the suit as a defendant or a third party defendant unless there is a compelling reason, such as in the case of a settling tortfeasor. Cavalier, 94-1496 at pp. 9-10, 657 So.2d at 981-82.
In the present case, Mr. Kimble was not made a party to this litigation by either plaintiffs or defendants, nor was he a settling tortfeasor. Under these circumstances, there was no compelling reason for the trial court to quantify Mr. Kimble's fault, and the trial court erred in doing so. Cavalier, 94-1496 at pp. 9-10, 657 So.2d at 981-82; Duplantis v. Danos, 95-0545, pp. 11-12 (La. App. 1st Cir. 12/15/95), 664 So.2d 1383, 1390-91. Accordingly, the 15% fault assessed to Kimble must be stricken, and that percentage of fault reapportioned to the other defendants using the ratio approach described in Guidry v. Frank Guidry Oil Co., 579 So.2d 947, 954 (La.1991), and cited with approval in Cavalier. Duplantis, 95-0545 at p. 12, 664 So.2d at 1390-1391; Stockstill v. C.F. Industries, Inc., 94-2072, p. 17 (La.App. 1st Cir. 12/15/95), 665 So.2d 802, 816, writ denied, 96-0149 (La. 3/15/96), 669 So.2d 428. The trial court assigned 20% fault to Borden, 25% fault to plaintiff, and 40% fault to Mr. Greaud. Using the ratio approach, Borden's fault is increased to 23.53%, plaintiff's fault is increased to 29.41%, and Mr. Greaud's fault is increased to 47.06%.

APPORTIONMENT OF FAULT
On appeal, plaintiffs assert the trial court erred in assigning fault to Mr. Couvillion and Mr. Greaud and, alternatively, in the amount *282 of fault assigned to each. Borden and PALA argue the trial court erred in assessing 20% fault to Borden. All appellants complain of the trial court's finding that DOTD was free of fault.
In apportioning fault, the factfinder should consider both the nature of each party's conduct and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La. 1985); Duplantis, 95-0545 at p. 12, 664 So.2d at 1391. It is well-settled that the allocation of fault is a factual matter within the sound discretion of the trial court, which will not be disturbed on appeal in the absence of manifest error.[3]Duplantis, 95-0545 at p. 12, 664 So.2d at 1391.
Where there is conflict in the testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where two permissible views of the evidence exist, the factfinder's choice between then cannot be manifestly wrong. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 4 (La. 1/29/96), 666 So.2d at 1073-1077. An appellate court must always keep in mind that if a trier-of-fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently. Mistich, 95-0939, p. 5, 666 So.2d at 1077.
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Moreover, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. This language places the responsibility of determining which expert was more credible on the trial judge. Id.
In the present case, there was conflicting evidence regarding whether, and to what extent, the various parties to this litigation where at fault. In apportioning fault, the trial court gave extensive written reasons for judgment, which included numerous factual findings and the court's conclusions regarding the conduct of the respective parties. After a thorough review of the record and consideration of the respective duties and conduct of the parties, as well as an examination of the trial court's written reasons for judgment (which are attached as an appendix hereto), we cannot say that the trial court's factual findings were clearly wrong. The trial court's apportionment of fault was reasonable and a permissible view of the evidence presented. While this Court may have apportioned fault differently had it been the trier-of-fact, it is not the function of an appellate court to substitute its judgment for that of the trial court. Accordingly, we find no manifest error in the trial court's apportionment of fault.

MOTION FOR NEW TRIAL
Plaintiffs assign error to the trial court's refusal to grant a new trial to increase Borden's percentage of fault in light of evidence discovered by plaintiffs after trial. The newly discovered evidence was the fact that "Borden Chemical knew it had been held liable for a pedestrian accident prior to [Mr. Couvillion's] and thus was on clear notice that the crossing was hazardous and it had a responsibility to protect against the hazard." Plaintiffs derived this evidence from a prior suit filed against Borden's, which plaintiffs' counsel learned of after trial in a chance conversation with an attorney who witnessed the trial in the earlier litigation.
La.C.C.P. art. 1972(2) provides that a new trial shall be granted "[w]hen the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial." This provision has consistently *283 been interpreted to mean that a new trial should be granted on the grounds of newly discovered evidence where such evidence is not merely cumulative, would tend to change the result of the case, was newly discovered after trial, and could not, with due diligence, have been obtained before or during trial. Hampton v. Rubicon Chemicals, Inc., 579 So.2d 458, 463 (La.App. 1st Cir. 1991).
In the present case, the trial court did not give reasons for denying plaintiffs' motion for new trial. However, we note the alleged newly discovered evidence relates to the issue of Borden's prior notice of the danger presented and its responsibility therefor. In its reasons for judgment, the trial court found Borden had prior notice of the danger due to complaints made by employees at PALA safety meetings at which Borden managerial employees were present. Therefore, the trial court may have concluded the newly discovered evidence was merely cumulative of other evidence introduced at trial. Plaintiffs' argument that the newly discovered evidence was "far more significant than notice based on isolated worker complaints" is unpersuasive. Based on the evidence of prior complaints, the trial court had already found Borden possessed prior notice of the danger to contractor's employees. The newly discovery evidence pertained to this same issue. In order to warrant a new trial, newly discovered evidence must be such that it would tend to change the result. Hampton, 579 So.2d at 463. In this case, the trial court obviously concluded the new evidence would not have changed the result it originally reached. Under the circumstances, particularly the essentially cumulative nature of the evidence, we cannot say the trial court erred in denying the motion for new trial. See Village of Varnado v. Fire Dept., 563 So.2d 946, 951 (La.App. 1st Cir.1990).

CREDIT
Borden and PALA argue the trial court erred in not allowing Borden's credit against its liability to plaintiffs for the settlement funds plaintiffs received prior to trial from Mr. Greaud and plaintiffs' uninsured motorist carrier. We disagree.
In Fertitta v. Allstate Ins. Co., 462 So.2d 159, 163-64 (La.1985), the Louisiana Supreme Court held that where the uninsured motorist carrier and the tortfeasor were solidarily liable, payments made by the UM carrier could in some situations be imputed to the debt owed by the tortfeasor as the result of a subsequent judgment, if the UM carrier has waived subrogation and reimbursement rights. Under the holding of Fertitta a tortfeasor is not entitled to an offset or credit in the absence of evidence that the UM carrier waived its subrogation or reimbursement rights. See Fertitta, 462 So.2d at 163-64; Bullock v. Harrell, 94-515, pp. 1-2 (La.App. 5th Cir. 11/29/94), 646 So.2d 1181, 1182. Since the record in the present case is devoid of evidence of the required waiver by plaintiffs' UM carrier, Borden's claim for a credit for the payment made by plaintiff's UM carrier must fail. Id. Further, the release of one tortfeasor does not entitle another tortfeasor to a dollar-for-dollar credit for the amount paid to the plaintiff in settlement, but only to a proportionate reduction in the total amount of the plaintiff's recovery. See Carroll v. Kilbourne, 525 So.2d 284, 287 (La.App. 1st Cir.1988).

INDEMNIFICATION
In its answer to Borden's appeal, PALA asserts the trial court erred in holding on Borden's third-party demand that PALA must indemnify Borden for any amounts Borden is held liable to plaintiffs.[4] PALA argues the indemnification agreement it had with Borden, which was the basis of the trial court's decision, was inapplicable in this instance because it is limited to occurrences on Borden's premises, and the accident at issue herein occurred outside Borden's premises on a public highway. We disagree.
Article XI, Subsection B of the agreement between PALA and Borden provided:
[PALA] agrees to indemnify, defend and save [Borden] ... harmless from and against any and all claims, suits and liabilities *284 based upon ... injury to any person (including death) arising out of or attributable to the presence of [PALA], its employees, subcontractors or agents ... upon the premises of [Borden] or the performance or non-performance by [PALA] ... of the work to be performed ... including but not limited to injuries or damages caused solely or in part by the negligence of [Borden].[5]
In construing indemnify agreements, the general rules governing the interpretation of contracts apply. Brown v. Drillers, Inc., 93-1019 (La. 1/14/94), 630 So.2d 741, 758. A contract of indemnity will not be construed to indemnify a party against the consequences of his own negligence unless such an intention is expressed in unequivocal terms. Perkins v. Rubicon, Inc., 563 So.2d 258, 259 (La.1990). Where there is anything doubtful in indemnity agreements, the court must endeavor to ascertain the common intent of the parties. Poole v. Ocean Drilling & Exploration Co., 439 So.2d 510, 511 (La. App. 1st Cir.), writ denied, 443 So.2d 590 (1983).
In the present case, PALA argues the language of the indemnity agreement limits its application to "those occurrences on the premises of Borden Chemical." We do not construe the language of the agreement to be so limited. The agreement provides that PALA will indemnify Borden for all personal injury liability arising out of or attributable to PALA's presence on Borden's premises or the performance or non-performance by PALA of the work to be performed under the agreement. Thus, under the clear language of the agreement, if the personal injury arises out of the performance or non-performance of the contract work, indemnification is owed by PALA even if the injury did not occur on Borden's premises.
The Louisiana Supreme Court has construed language similar to that in the present case, requiring indemnification for injuries "arising out of" the performance of contract work. The Supreme Court held that the "arising out of" language required a connexity similar to that which is required in determining cause-in-fact, i.e., "[w]ould the particular injury have occurred but for the performance of work under the contract?" Perkins, 563 So.2d at 259. In Perkins the Supreme Court held that this requirement was clearly met because but for the performance of the work under the contract, the plaintiff would not have been present at the site to be injured. Similarly, in the present case, but for the performance of the contract work by PALA, plaintiff would not have been crossing La. Hwy. 73 to reach the designated parking lot where he was required to park by Borden. Under these circumstances, and in view of the fact that the agreement unequivocally indicates the intention that Borden should be indemnified even against it own negligence, we find no error in that portion of the judgment requiring PALA to indemnify Borden.

AWARD FOR LOSS OF CONSORTIUM
Plaintiffs argue the $15,000.00 award to Mrs. Couvillion for loss of consortium is inadequate. In support of their argument, plaintiffs point to the testimony regarding a negative personality change Mr. Couvillion underwent following his accident, which included depression and alcohol abuse. Plaintiffs also note that it was necessary for Mrs. Couvillion to get a job to make ends meet, although she only worked for several months.
The compensable elements of a claim for loss of consortium include loss of love and affections, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Higley v. Kramer, 581 So.2d 273, 282 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (1991). Because the trier-of-fact's discretion in assessing damages is so great, a damage award should be disturbed on appeal only when the award is, in either direction, beyond that *285 which a reasonable trier-of-fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In its written reasons for judgment, the trial court noted with respect to its award for loss of consortium that:
Faith Couvillion testified extensively regarding the changes in their lives during Mr. Couvillion's recuperation from his injuries, as well as changes which have taken place since then. She testified how it became necessary to get a job working at night to assist with financial obligations. She also testified regarding additional duties she had to perform around their home. [sic] as well as their decreased activity since the accident. Accordingly, she is awarded Fifteen Thousand and No/100 ($15,000.00) Dollars for loss of consortium.
The trial court's reasons indicate it properly considered the facts and circumstances present in this particular case in making its award. While the award may be on the low end of the range of possible awards within the trial court's discretion, we cannot say it is an abuse of the trial court's much discretion. See Billeaud v. Poledore, 603 So.2d 754, 761 (La.App. 1st Cir.), writ denied, 608 So.2d 176 (1992); Peterson v. Western World Ins. Co., 536 So.2d 639, 646 (La.App. 1st Cir.1988), writ denied, 541 So.2d 858 (1989); Rudd v. Atlas Processing Refinery, 26,048, pp. 17-18 (La.App. 2nd Cir. 9/21/94), 644 So.2d 402, 412, writ denied, 94-2605 (La. 12/16/94), 648 So.2d 392.

LOSS OF ENJOYMENT OF LIFE AND LOSS OF EARNING CAPACITY
In their last assignment of error, plaintiffs argue the trial court erred in denying Mr. Couvillion's claims for loss earning capacity and loss of enjoyment of life. Plaintiffs maintain the trial court's failure to address these items amounted to a rejection of the claims.
We do not agree with plaintiffs' assertion that the trial court necessarily rejected the claim for loss of enjoyment of life. The present case is not one where the trial court specifically rejected this item of damage. There is no requirement that the trial court separate its award for general damages into specific categories. Lougon v. Era Aviation, Inc., 609 So.2d 330, 346 (La.App. 3rd Cir.1992). It is possible that the trial court considered the evidence regarding plaintiff's loss of enjoyment of life in making its award for pain and suffering, since the trial court did not indicate this award was for physical pain and suffering only. See Lougon, 609 So.2d at 346. Considering the award for pain and suffering in this light, we find no abuse of the trial court's great discretion in the amount awarded. Youn, 623 So.2d at 1261.
Regarding the claim for loss of earning capacity, we note that we do not believe the trial court was required to award a separate amount for loss of earning capacity, but could have included damages for this item within an award for loss of future earnings. See Willis v. Letulle, 597 So.2d 456, 478 (La.App. 1st Cir.1992); Andrews v. Mosley Well Service, 514 So.2d 491, 499 (La.App. 3rd Cir.), writ denied, 515 So.2d 807 (1987). However, in this case, the trial court awarded $11,868.00 for future lost wages, which corresponded exactly with the amount of income plaintiffs' economist testified would be lost during the three month recuperative period for future surgery contemplated by Mr. Couvillion. Therefore, the trial court obviously awarded plaintiffs future lost wages only for the anticipated recuperative period, and did not include any amount for loss of earning capacity.
Damages for loss of earning capacity are based on a person's ability to earn money, rather than on what he earned before the accident. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). Thus, damages for loss of earning capacity may be awarded even when the plaintiff has not suffered a loss of income after the accident. See Hobgood, 574 So.2d at 347-48.
In the present case, the evidence revealed that, since Mr. Couvillion recuperated sufficiently to return to work, he has worked *286 steadily. His income is now higher than it was before the accident. The evidence presented regarding Mr. Couvillion's loss of earning capacity consisted primarily of plaintiffs' testimony of the alleged tenuous nature of his employment situation and the loss of his career path at PALA. There was also testimony regarding Mr. Couvillion's physical restrictions. The evidence presented by plaintiffs regarding loss of earning capacity was highly speculative. Considering the circumstances, and the weight which must be accorded to the trial court's findings, we cannot say the trial court erred in concluding plaintiffs failed to carry their burden of proving a loss of earning capacity.

CONCLUSION
For the above reasons, that portion of the trial court judgment assessing 15% fault to Virgil Kimble, Jr., is reversed. Additionally, the judgment of the trial court is hereby amended to increase the fault assessed to Borden from 20% to 23.53%, to increase the fault assessed to Mr. Couvillion from 25% to 29.41%, and to increase the fault assessed to Mr. Greaud from 40% to 47.06%. The judgment of the trial court is affirmed in all other respects. The costs of this appeal are to be shared equally by Borden and PALA.
REVERSED IN PART; AMENDED IN PART; AS AMENDED, AFFIRMED.
 APPENDIX
 Filed Sept. 29, 1994.
MR. AND MRS. CHARLES COUVILLION 23RD JUDICIAL DISTRICT COURT
VERSUS NO. 36,640 PARISH OF ASCENSION
SHELTER MUTUAL INSURANCE COMPANY STATE OF LOUISIANA
FILED:___________________________ _______________________________
 CLERK OF COURT
******************************************************************
 REASONS FOR JUDGMENT
******************************************************************

FACTS:
On January 22, 1985, Charles Arlen Couvillion ("Couvillion") was exiting the Borden Chemical Plant, which is located on the east side of Louisiana Highway 73 in Ascension Parish, Louisiana. At approximately 5:30 a.m., Couvillion, who worked for PALA, Inc. (hereinafter "PALA"), had just finished his shift and was proceeding to his vehicle across Highway 73 into a contractor's parking lot on the west side of that highway. Thirty feet behind Couvillion was Webster Sequin, Sr., who had car-pooled with Couvillion and was to ride home with him. Immediately in front of Couvillion was Virgil Kimball and James McLean, Jr. McLean was 40 or 50 feet off of Louisiana Highway 73 as Couvillion entered Louisiana Highway 73. At this time Kimball was in the southbound lane of Highway 73 a few feet from its west edge.
It was a cold morning with the temperature below freezing. Couvillion was wearing blue jeans, a dark hooded jacket with fur fringe and a helmet liner for warmth.
At approximately 5:30 a.m., Couvillion entered Louisiana Highway 73, and was either in the middle of that highway, or in the outermost southbound lane, when he was struck by a vehicle being driven by Joseph Greaud ("Greaud"). Greaud swerved his vehicle in order to avoid hitting Virgil Kimball, and struck Couvillion as he crossed the highway.
It was dark outside and there was a slight mist in the air. Greaud was familiar with the accident site. He had driven the exact same route on numerous occasions prior to the accident, including several mornings, and had also seen pedestrians cross at that location on numerous occasions.
*287 At the time of the accident, the traffic control devices governing Geraud's southbound path of travel down Louisiana Highway 73 were striped double yellow line, a "Pedestrian Crossing" sign 82 feet before the crossing area, a "Plant Entrance" sign and a 50 mph speed limit sign.
Couvillion suffered a closed fracture of the tibia and fibula bones in his right leg, and a closed head injury as a result of the accident. He later developed ulnar nerve difficulties as a result of treatment for his original injury (Trial Deposition of Richard Robichaux).
Mr. and Mrs. Couvillion filed suit against Joseph Greaud, his liability insurer, Shelter Mutual Insurance Company, (their UM insurer), the State of Louisiana through the Department of Transportation and Development ("DOTD"), and Borden Chemical Company ("Borden") as a result of injuries sustained in the accident. Claims against Joseph Greaud and his insurer were settled for $10,000.00. Further, claims against Shelter Mutual Insurance Company, the uninsured motorist insurer, were settled for $100,000 on March 15, 1988.

STIPULATIONS:
By stipulation the following exhibits were introduced, marked and filed:
P-1 Deposition of Dr. Richard Robichaux;
P-2 Deposition of Dr. Lionel Smith;
P-3 Responses to Production of Documents;
P-4 Interrogatories and Answers; and
P-5 Photograph of the Borden plant.

THE WITNESSES:
The plaintiff called James Richard McLean, Webster D. Sequin, Sr. Joseph Greaud, the driver of the vehicle that struck the plaintiff, Charles Couvillion, the plaintiff, Duane Evans, an expert in the field of traffic engineering, Dr. Randy Rice an expert in the field of economics, Pat West safety manager for Borden, Faith Couvillion, the plaintiff's wife, Sylvanus Walker, an expert in the field of accident reconstruction, and Dty. Greg Tuillier of Ascension Parish Sheriff's Office. Plaintiff filed P-25 the deposition of Virgil Kimble.
During the presentations the following additional stipulations were entered:
By stipulation the following additional exhibits were introduced, marked and filed:
P-19 Borden Chemical letter dated 6/26/70;
P-20 State D.O.T.D. letter dated 7/27/70;
P-21 State D.O.T.D. letter dated 9/6/83; and
P-22 State D.O.T.D. letter dated 1/17/84
It was further stipulated that Aetna Casualty & Surety Company as workman's compensation carrier for Pala, Inc. paid to the plaintiff Charles Couvillion $16,120.00 in disability benefits beginning in December of 1985 and ending April 1986. It also paid out medical bills totaling $30,286.40
State D.O.T.D. and Borden, Inc. both moved for involuntary dismissal at the conclusion of plaintiff's case. Both motions were denied.
State D.O.T.D. called the following witnesses in defense Trooper Robert Landry, Thomas J. Buckley, a state traffic engineer, Jeffrey T. Milburn an expert in the field of traffic engineering and accident reconstruction.
Borden Chemical, Inc. recalled Pat West.
Borden, Inc. and Pala, Inc. introduced Joint Defendant Exhibit No. 1 a contract between Borden, Inc. and Pala, Inc. providing in part for Pala, Inc. to indemnify Borden Chemical, Inc.
Pala, Inc. called the plaintiff Charles Arlen Couvillion as its only witness.
The testimony of JOSEPH GREAUD and the deposition testimony of VIRGIL KIMBLE, JR. gave the greatest insight as to how the accident happened.
JOSEPH GREAUD the driver of the vehicle that struck the plaintiff, testified that:
The weather was coldbelow freezing; it was still dark; he had his headlights on: he noticed a yellowish glare from plant lights; he didn't notice haze or mist (he added that if present it would have been frozen) and impact was directly across from the guard shack.
*288 He was then asked that as he approached the area what did he notice in reference to pedestrian activity. He responded:
"Well there was 2 or 3 of them that I almost hit, uh, they were in the road and they were between the center line and the shoulder in my lane. I noticed those and the next thing I knew, I hit Mr. Couvillion."
His further testimony indicated that when he first noticed the pedestrians he was going 50; the pedestrians were between the middle of the lane and the shoulder; right at the very shoulder of the road; they were just a few feet from the far edge; his headlights were on low beam; when he noticed the 2 or 3 pedestrians he steered to the left and struck another pedestrian; he never saw that pedestrian until the instant before he hit him; he hit his brakes immediately after impact; he usually passes the area in the afternoon when a police officer directs traffic; he was going to work at nearby Plimsol and was ten minutes late for work; he had called in late and was not particularly hurrying.
MR. GREAUD's version of events was for the most part corroborated by the deposition of testimony of VIRGIL KIMBLE, JR. He was crossing the road in front of the plaintiff COUVILLION. MR. KIMBLE's deposition statements included the following;
At pp 5 & 6:
"A. Yes, sir. And we was coming out across the road, and I seen a car coming. I got on across the road. I got out to the end, and he was coming kind of fast. And Arlin (sic) and them was coming across the road, and they had another guy next to the road. And the guy was coming down the road, and he just hit Arlin. And he come around and slid into the left lane and got Arlin. And I jumped on across the road, and I turned around and that's when I seen the car, you know, hit Arlin. (sic) He was sliding coming over into the left lane and hit Arlin." (sic) ...
At p. 15:
Q. All right. So, when you first saw the car, you figured you had plenty enough time to get across
A. Yes. I had enough time.
Q. so you didn't have to run or anything?
A. No.
Q. You just walked across?
A. I just came across. And I got right there in the road, you know, and I jumped off on to the side there because he was sliding. He scared me....
At page 16:
Q. But he saw you, and you think you're the one that caused him to hit his brakes?
A. Probably so.
Q. Because you were the only one in the lane.
A. I was the only one in the road, you know, right then.
Q. So he
A. Arlin was coming in the left lane.
At p. 25:
Q. You testified that when you were a few steps from the edge of the road you went ahead and jumped off the road and almost jumped in the ditch.
A. Uh huh.
At p. 27
Q. Let me discuss that with you for a moment. It's my understanding that Mr. Couvillion was walking to get across the other side of the road and was near or at the center line, and, to you, appeared that he was going to continue on across into the right lane of travel?
A. Uh huh....
At. p. 29:
Q. Did Mr. Couvillion do anything that indicated to you that he saw the vehicle before the vehicle hit him?
A. No. Like I said, he was just stunned there, you know....
At p. 31
Yes. We was all right there next to the road, yes.
Q. Were you all (sic) all standing next to the road at one time?
A. Yes, at one time, yes. We was all right there and we come on across the road, and *289 Arlin (sic) came, and then, they had them other guys next to the road.
Q. All right. You, Mr. Couvillion and several other people were on the
A. But me and Arlin (sic) was the only two in the road.
Q. I understand that. But, at one time, before you ever started crossing the road, you, Mr. Couvillion and several other people were there on the side of the road waiting to cross?
A. Yes, we was right there, yes. Well, Arlin (sic) was behind me. I knew he was behind me, but I was the first out....
The plaintiff CHARLES ARLEN COUVILLION, testified that on January 22, 1985 he had been installing trays in towers; at 5:30 a.m. his shift finished and he was heading for the gate; the weather was in the twenties; he wore a jacket an insulated undershirt and a helmet liner; he and his co-workers had to cross the highway on their own; this matter had been discussed at safety meetings; he indicated that he felt night shift people were discriminated against because the day shift had a crossing guard to assist workers crossing the highway.
The plaintiffs' testimony was sketchy on details of the accident. He remembered waking up in a hospital room and seeing a T.V. set on the wall.

THE EXHIBITS:
Exhibits helpful to a decision in this case included:
P-1 Deposition of Dr. Richard Robichaux;
P-2 Deposition of Dr. Lionel Smith;
P-5 Aerial photographBorden plant;
P-10 Duane Evans' diagram of accident scene;
P-15 & 16 Borden/DOTD correspondence;
P-19-22 Borden/DOTD correspondence.

STATUTORY AND CASE LAW CONSIDERED:
The court considered:
R.S. 32:213 regulating pedestrian crossing other than at cross walks;
R.S. 32:214 regulating drivers using due care to avoid colliding with pedestrians
C.C.Art. 2323 dealing with comparative negligence;
Louisiana appellate decisions involving pedestrians and motors vehicles including: Bennett v. State D.O.T.D. 503 So.2d 1022 (LaApp 2 Cir1987) Harrison v. Keller 524 So.2d 212, (LaApp 4 Cir1988), Devereaux [Devereux] v. Allstate Insurance Co. 557 So.2d 1091 (LaApp 2 Cir1990), Haney v. Francewar 588 So.2d 1172 (LaApp 1 Cir1991) and Blair v. Tynes 621 So.2d 591 (La1993); and Louisiana appellate decisions dealing with comparative negligence including Lemire v. New Orleans Public Service, Inc. 458 So.2d 1308 (La1984), Varnado v. Continental Insurance Company 446 So.2d 1343 (LaApp 1 Cir1984) and Perez v. State D.O.T.D. 578 So.2d 1199 (LaApp 4 Cir1991).

FINDINGS OF FACT AS TO LIABILITY:

1.
On January 22, 1985, defendant Borden Chemical Company (hereinafter "Borden") operated a chemical plant located in Ascension Parish on Louisiana Highway 73.

2.
Employees of maintenance contractor PALA, Inc. ("PALA") parked in a lot owned by Borden, and located on the opposite side of Louisiana Highway 73 from the plant. These contract workers entered and exited the plant via the closest gate adjoining Louisiana Highway 73, Gate 5.

3.
The State of Louisiana, through the Department of Transportation and Development ("DOTD") is in charge of designing and maintaining Louisiana Highway 73, and was acting in that capacity on January 22, 1985.

4.
On January 22, 1985, the following traffic control devices were present and governing the operation of southbound mother vehicles on Louisiana Highway 73 at or near Gate 5 of the Borden Chemical Plant:
1. A striped double yellow line;
2. A "Plant Entrance" sign;
*290 3. A Yellow "Pedestrian Crossing" sign; and
4. A 50 mph speed limit sign.

5.
Due to the lack of prior accidents in the area and other facts evidenced in P-15, 16, 19, 20, 21, and 22 the State D.O.T.D. was not negligent in failing to provide other traffic control devices.

6.
On January 22, 1985, at approximately 5:30 a.m., Couvillion had completed a 10 hour shift for PALA, and was exiting the Borden plant at Gate 5 to the designated parking area for PALA employees. Couvillion was wearing a dark blue coat, pants and a hooded parka liner for warmth. Couvillion was proceeded by two other workers, Virgil Kimball and James McLean, and followed by Wester Sequin. His view down Louisiana Highway 73 was unobstructed.

7.
At about the same time, a car being driven by Joseph Greaud ("Greaud") was traveling southbound on Louisiana Highway 73. Greaud was late for work at the time. Further, Greaud had travelled down Louisiana Highway 73 past the Borden plant for years prior to the accident, and for several weeks early in the mornings prior to the accident. Further Geraud was fully aware that pedestrians crossed from the Borden plant to the parking area from time to time.

8.
Also present in the roadway was Virgil Kimble, Jr. an employee of Terolechnology who worked beside Mr. Couvillion and whose shift was ending at the same time. He is found to have been in the Southbound lane of Highway 73 a few feet from the West edge. He observed the Greaud vehicle and jumped to the side of the road.

9.
Couvillion entered Louisiana Highway 73 and was struck near the middle of the highway, by a vehicle being driven by Joseph Greaud.

10.
Couvillion suffered fractures of the tibia and fibula in his right leg, a closed head injury and nerve damage as a result of the accident.

11.
The accident happened when Greaud belatedly observed Kimble in the roadway, swerved to the left to avoid him and struck the plaintiff Couvillion.

12.
Couvillion violated R.S. 32:213 by failing to observe the Greaud vehicle (even to the extent of being unable to attempt evasive action) and by failing to yield the right of way to vehicular traffic.

13.
Kimble did observe the approaching Greaud vehicle but violated R.S. 32:213 by also failing to yield.

14.
Greaud violated R.S. 32:214 by failing to timely observe ahead, being inattentive, driving too fast under the circumstances and failing to use due care to avoid colliding with pedestrians.

15.
On January 22, 1985, defendant Borden Chemical Company (hereinafter Borden) operated a chemical plant located in Ascension Parish with its northeast border being Louisiana Highway 73. In this area, Louisiana Highway 73 runs northeast/southwest from Louisiana Highway 30 to the Mississippi River.

16.
For a period of years prior to January 22, 1985 and up to the present day, Borden has required employees of its maintenance, PALA, Inc. (hereinafter PALA), to park in a parking lot owned by Borden and located across Louisiana Highway 73. These contract workers were required to enter the plant via the closest gate adjoining Louisiana Highway 73, Gate 5. Workers traversed the highway from the plant to the parking lot in a general area approximately 140 feet in length.

17.
The only pedestrian control instituted by Borden or one of its contractors was to hire an off-duty Sheriff's Deputy to stop traffic in *291 the afternoon until the parking lots cleared at the end of the normal weekday day shift. Borden did have a sheriff's deputy drive through the parking lot for security purposes early every morning. There were no street lights of any type in the crossing area and there was some glare to motorists on Louisiana Highway 73 emanating from lights inside the plant. The speed limit was 50 miles per hour on Hwy 73.

18.
Prior to January 22, 1985, PALA workers regularly complained of the hazard associated with crossing the highway in the dark during turnaround operations and asked from some type of curative measure. Borden managerial employees were present at the safety meetings where these complaints were made.

19.
The Court concludes that there was a greater need for an off duty Sheriff's Deputy to Control traffic in the dark at 5:30 a.m. than, in the afternoon at the end of a normal weekday shift.

CONCLUSIONS OF LAW

1.
Charles Arlen Couvillion failed to use reasonable care, failed to observe and violated R.S. 32:213 by filing to yield the right of way to vehicular traffic.

2.
Virgil Kimble, Jr. did observe, but failed to use reasonable care and violated R.S. 32:213 by failing to yield to vehicular traffic. His negligence was less than that of Couvillion because he did observe the oncoming Greaud vehicle.

3.
Joseph Greaud breached his duty to maintain a proper lookout and to see things he should have seen. Although he drove within the speed limit he drove at an excessive rate of speed under the circumstances that he should have observed and to exercise due care to avoid colliding with pedestrians in the roadway.

4.
Joseph Greaud cannot avail himself of the protection of the "sudden emergency" doctrine when the emergency is of his own creation. Ricard [Recard] v. Trinity Universal Ins. Co., 503 So.2d 519 ([La.App.] 3rd Cir., 1987), writ granted, 506 So.2d 105 (La1987), appeal dismissed, 509 So.2d 1011 (La.1987); Nicholas v. Voiron, 568 So.2d 1139 ([La.App.] 5th Cir.1990). He was not proceeding prudently and cautiously under the circumstances, and acted inappropriately when confronted with the existence of pedestrians.

5.
Borden Chemical Company was guilty of negligence in requiring contract employees to cross La Hwy 73 unprotected, in failing to provide an off-duty deputy or other traffic control individual and in failing to take curative measures after the dangers were discussed at safety meetings.

6.
The above considered the court concludes that liability should be apportioned as follows:

CHARLES ARLEN COUVILLION 25%
VIRGIL KIMBLE, JR. (WHO WAS NOT SUED) 15%
JOSEPH GREAUD 40%
BORDEN CHEMICAL COMPANY 20%
STATE, D.O.T.D. 0%
 ____
TOTAL 100%

Having decided liability, we now turn to the issue of quantum in this matter. Charles Couvillion, who was 49 years old at the time of this accident, testified at trial regarding his injuries. The depositions of his treating orthopedic surgeon, Dr. Richard Robichaux and his treating opthalmologist, Dr. Lionel Smith were introduced into evidence.
Following the accident, Mr. Couvillion was taken to East Ascension General Hospital, then transferred to Our Lady of the Lake Hospital, where he was treated for spiral fracture of the fibula, a closed head injury, and fractured ribs with pulmonary contusions. According to Dr. Robichaux, Mr. Couvillion was taken to the intensive care unit where a cast was placed on his right leg and *292 he was observed for his head injury. On January 29, 1985, the head injury had progressed to such a point that he was taken to the operating room and placed under general anesthesia. At this time the fracture was opened and manipulated to align the bones. A long leg cast was placed and Mr. Couvillion was discharged from the hospital on February 2, 1985. When he was discharged, he had to use a wheelchair and a walker to ambulate. He visited Dr. Robichaux on a regular basis following his discharge. Dr. Robichaux testified that in July of 1985 there were definite signs that the tibial fracture had not healed a condition known as nonunion. At this point, Mr. Couvillion was admitted to the hospital and a 13 inch metal rod was placed in his lower leg. A bone graft using bone from Mr. Couvillion's hip was placed at this time and a small portion of the fibula was excised in order to facilitate bone healing. Following this surgery he was placed in a short leg cast and remained on crutches until the cast was removed on October 18, 1985.
Mr. Couvillion continued to visit Dr. Robichaux on a regular basis following the second surgery. Dr. Robichaux testified that Mrs. Couvillion noticed that Mr. Couvillion was forgetful and Dr. Robichaux felt that this was consistent with his previous head injury. In September, 1985 Mr. Couvillion told Dr. Robichaux that he had numbness in the fingers of his right hand. He was referred to another physician who performed an EMG and Nerve Conduction studies which indicated Mr. Couvillion had ulnar neuropathy. Later studies also revealed that Mr. Couvillion had mild carpal tunnel syndrome. Dr. Robichaux testified that the ulnar neuropathy was probably a result of the way he was positioned following his initial injury. The cause of the carpal tunnel syndrome was less clear, but Dr. Robichaux testified that it was more probable than not that the carpal tunnel syndrome was related to the accident.
In January 1986 a heel lift was obtained for Mr. Couvillion, at Dr. Robichaux's suggestion, because his right leg was one inch shorter than the left. Dr. Robichaux testified that during this time, Mr. Couvillion complained of leg pain which was caused by the rod, and of knee pain which was caused by stretching of the knee ligaments at the time of the initial injury.
Dr. Robichaux felt that Mr. Couvillion was able to go back to work in May 1986, although he felt that prolonged standing, walking long distances, and climbing would all be difficult.
In May 1989, Mr. Couvillion returned to Dr. Robichaux and complained that he had swelling in his right lower leg. Dr. Robichaux explained that his was caused by pooling of blood in the area because small blood vessels were damages in the accident and were unable to carry all of the blood back to the heart. Dr. Robichaux prescribed compression stockings for this condition.
Mr. Couvillion visited Dr. Robichaux on an as needed basis throughout 1991, 1992 and 1993, where he complained of knee pain, leg swelling ulnar nerve symptoms and left hip and back pain due to the leg length discrepancy.
Dr. Robichaux testified that Mr. Couvillion would need the following surgical procedures in the future; Removal of hardware in his leg, cost $5,000.00; ulnar nerve transfer, cost $3,000-$4,000; carpal tunnel release, cost $2,500. Dr. Robichaux testified he would probably miss a total of nine to twelve weeks of work after having these procedures performed.
The deposition of Dr. Smith, who treated Mr. Couvillion for his complaints of double vision, was also received into evidence. Dr. Smith explained that Mr. Couvillion has double vision, due to left paretial thirst nerve paresis, or weakness. Dr. Smith prescribed corrective glasses for this condition which enable Mr. Couvillion to see singly. If Mr. Couvillion should decide that he is not comfortable with the glasses, there is a surgical procedure available to correct this.
Mr. Couvillion also testified regarding his injuries. He stated that his right leg was broken in two places and is now shorter than the left leg. He stated that he had weakness in his right hand and numbness in two fingers on that hand, which prevents him from swinging a hammer as hard as previously. He also spoke of his double vision. Mr. *293 Couvillion testified that he plans to have the rod surgically removed from his leg. He pointed out to the Court the area of his right leg just above his ankle which wells up after he "walks a while". He is unable to kneel down or to run.
The plaintiffs have argued that Mr. Couvillion has suffered four distinct injuries: The fractured leg, the injured arm, the double vision and the head injury. This Court agrees and thus will consider each injury separately.
A review of the jurisprudence indicates that general damage awards in cases involving fractures of the bones of the leg range from the low of $25,000 to a high combined award of $450,000.00 for special and general damages.
In McCardie v. Wal-Mart, Inc. 522 So.2d 1319 (LaApp 2 Cir), writ denied, 524 So.2d 521 (La1988), the plaintiff was awarded $25,000 in general damages following a fractured tibia and fibula, and lumbosacral sprain. Her tibia healed "non-united" causing pain and swelling in her ankle," but she did not undergo any surgeries.
In Roberts v. State through DOTD, 576 So2d 85 (LaApp 2 Cir1991) the Court reduced a jury award of general damages in the amount of $250,000 to $150,000 to a 61 year old woman who suffered a concussion, lacerations to the chin and lip and a fracture of the femur. The plaintiff in Roberts spent two weeks in the hospital initially and two days in the hospital at a later date to remove hardware from her leg. A 25% disability of the leg was assigned.
Finally, in Jaffarzad v. Jones Truck Lines, 561 So2d 144 ([La.App.] 3rd Cir1990), the plaintiff suffered a compound fracture of the femur in his left leg, a contusion to the right leg, lacerations to the left knee and deep lacerations to the right knee extending into the knee joint. He spent nearly 3½ months in the hospital initially and had two later hospitalizations, including five surgeries. He was assigned a 10-15% functional impairment to the left leg and a 5% disability to the right leg. The Appellate Court raised his special and general damage award to $450,000.
In the case at bar, the Court finds that Mr. Couvillion should be awarded $150,000 general damages for his leg injury.
The plaintiff cites two cases involving nerve injuries to the arm, which he feels are applicable in this case.
In Montgomery v. Opelousas General Hospital, 546 So2d 621 ([La.App.] 3rd Cir1989) the Court decreased a trial court award of $200,000 in total damages to $75,000 for general damages. Montgomery involved a 45 year old woman who sustained an injury to her median nerve during a venipuncture. The condition did not involve surgery.
In Weber v. Buccola-McKenzie, Inc. 541 So2d 315 ([La.App.] 5th Cir1989) the Court affirmed a $75,000 general damage award to a 61 year old woman who fractured her arm and had pain and numbness in several fingers at the time of trial. She was assigned a 25% disability rating. The court found that the award was on the high side, but did not constitute manifest error.
Mr. Couvillion testified that he has weakness, pain and numbness in his right hand. Dr. Robichaux testified that objective studies of the nerves in his right hand indicate that he has ulnar nerve neuropathy and carpal tunnel syndrome; although Mr. Couvillion's condition will require future surgery, his arm injury and resulting disability was not as severe as they suffered by the plaintiffs in the two cited cases. Accordingly, Mr. Couvillion is awarded $50,000 in general damages related to his arm injury.
Two cases involving eye injuries were cited by the plaintiff. In Buquoi v. Allstate Insurance Company 556 So2d 163 ([La.App.] 5th Cir1990), the Court increased a general damage award to $37,600 for a plaintiff who suffered permanent double vision, as well as a fracture to the bone under the eye and numerous cuts and abrasions. In Pastorello v. State Farm 538 So2d 749 (LaApp 5th cir 1989) the Court increased the plaintiff's total award to $37,000. In Pastorello, the plaintiff underwent surgery following an eye injury but he has permanent double vision in the extreme downward and upward gaze.
Mr. Couvillion has to wear glasses to correct his double vision, which is a permanent *294 condition. There is a surgical procedure available to him to correct this condition, however, no testimony was introduced regarding the cost of this surgery. Accordingly, Mr. Couvillion is awarded $25,000 in general damages as a result of his eye injury.
The plaintiff has cited cases involving general damage awards to plaintiff for head injuries. In Walton v. Bellard, 581 So2d 307 (LaApp 1st Cir1991) the Court affirmed a $30,000 general damage award to a plaintiff who suffered cervical sprain, contusions and lacerations to the scalp, contusions to the knee and a mild concussion. The plaintiff suffered from post concussion syndrome and possible traumatic neurosis, memory loss, headaches and nausea.
In Miller v. Hartford 567 So2d 823 (LaApp 3rd Cir1990), the Court awarded the plaintiff $50,000 for pain and suffering. The plaintiff suffered from a cerebral concussion, contusions, abrasions and lumbosacral strain. He also suffered from post-traumatic stress syndrome.
In the case at bar, Mr. Couvillion spent five days in the intensive care unit in order that his neurological status be closely observed for adverse affects from his closed head injury. There was very limited testimony introduced at trial as to Mr. Couvillion's memory loss and residual effects from the head injury. Accordingly, Mr. Couvillion is awarded $20,000 for general damages due to his head injury.
Dr. Randy Rice testified regarding Mr. Couvillion's past and future lost wages. Mr. Couvillion missed sixteen months of work following his injury and based on Dr. Rice's testimony, he is awarded Forty-Four Thousand Five Hundred Sixty-Five and No/100 ($44,565.00) Dollars for lost wages. He is also awarded Eleven Thousand Eight Hundred Sixty-Eight and No/100 (11,868.00) Dollars in future lost wages for the time he will need to recuperate following his future surgeries.
Faith Couvillion testified extensively regarding the changes in their lives during Mr. Couvillion's recuperation from his injuries, as well as changes which have taken place since then. She testified how it became necessary to get a job working at night to assist with financial obligations. She also testified regarding additional duties she had to perform around their home as well as their decreased activity since the accident. Accordingly she is awarded Fifteen Thousand and No/100 ($15,000.00) Dollars for loss of consortium.
For the foregoing reasons, damages are awarded to Charles Arlen Couvillion as follows:

1) Past Medical Expenses $ 30,931.90
2) Future Medical Expenses 11,000.00
3) Past Lost Wages 44,565.00
4) Future Lost Wages 11,868.00
5) Pain and Suffering 245,000.00

Faith Couvillion is awarded $15,000.00 for loss of consortium. In making this award the court considered comparable awards in Scarmado v. New Orleans Stevedoring Co. 595 So2d 1242 (LaApp 4 Cir1992). Turner v. Krauss Co., Ltd., 543 So2d 563 (LaApp 4 Cir1989) and Palmer v. Goudchaux/Maison Blanche, 588 So2d 737 (LaApp 5 Cir1991).

APPLICABILITY OF THE INDEMNITY AGREEMENT:
Finally, the court decides that the indemnity agreement between PALA AND BORDEN CHEMICAL is applicable to the case. The indemnity clause applied to claims "attributable to the presence of ... employees... upon the premises of Company or ... nonperformance by ... employees ... including injuries ... caused solely or in part by the negligence of company." See Perkins v. Rubicon, Inc. 563 So2d 258 (La1990) and Yocum v. City of Minden 566 So2d 1082 (LaApp 2 Cir1990).
Counsel for the plaintiff is to prepare the necessary judgment and submit the same to defendant counsel for approval as to form. The same will be signed upon presentation. Cost are to be paid by the defendant.
Convent, Louisiana this 29th day of September, 1994.
 /s/ [Signature]
 JUDGE
NOTES
[1] Plaintiffs also named their uninsured motorist insurer, Shelter Mutual Insurance Company, as a defendant, but later dismissed Shelter from the suit.
[2] The trial court also rendered judgment against plaintiffs on the intervention filed by Aetna Casualty & Surety Company, the workers' compensation carrier of plaintiff's employer. No issues have been raised on appeal as to this portion of the judgment.
[3] The fact that the trial court committed legal error in assessing fault to Mr. Kimble, a non-party, does not alter the standard of review to be applied with respect to the apportionment of fault to the remaining parties. Duplantis, 94-0545 at pp. 12-13, 664 So.2d at 1391; Stockstill, 94-2072 at p. 18 n. 6, 665 So.2d at 816.
[4] Alternatively, PALA requests that, should the judgment against Borden be modified to reduce its liability, the judgment against PALA should be modified to reflect those changes.
[5] In brief, PALA asserts the language of this provision was modified by the language of an Assumption of Risk provision, which was attached to the agreement as Exhibit B. However, we find no indication in the record that the assumption of risk provision (which Borden contended in a pre-trial memorandum related directly to PALA's permit to enter Borden's premises) was intended as a modification of the language of the indemnification provision.