664 So.2d 1383 (1995)
Leslie B. DUPLANTIS Individually and as Natural Tutrix of the Minor Child, Jacob Ryan Duplantis
v.
Belve P. DANOS, Allstate Insurance Company and Louisiana Department of Transportation and Development (Office of Highways).
No. 95 CA 0545.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
*1385 Danny J. Lirette, Houma, for Plaintiff-Appellee-Second Appellant Leslie B. Duplantis.
Randall L. Bethancourt, Houma, for Defendants Belve Danos and Allstate Insurance Company.
Barry G. Toups, Baton Rouge, for Defendant-First Appellant-Appellee State of Louisiana, Department of Transportation and Development.
Before CARTER and PITCHER, JJ., and CRAIN, J. Pro Tem.[1]
PITCHER, Judge.
In this wrongful death action, defendant, the State of Louisiana, through the Department of Transportation and Development (DOTD), appeals from a judgment of the trial court in favor of plaintiff, Leslie Duplantis. Plaintiff answered the appeal. We amend and affirm.

FACTS AND PROCEDURAL HISTORY
On February 2, 1993, at approximately 6:45 a.m., in Houma, Louisiana, Belve Danos (Mr. Danos) was involved in an accident with David Duplantis (Mr. Duplantis) which resulted in the death of Mr. Duplantis.
According to the testimony of the investigating officer, Trooper Leland Falcon, Mr. Danos, driving a 1979 Ford pickup truck, was travelling west on Prospect Avenue (LA 3087), when he attempted to make a left turn onto Coteau Road (LA 660).[2] At the time of the accident, the intersection was directed by flashing beaconsyellow for vehicles travelling on Prospect Avenue and red for vehicles proceeding on Coteau Road. In attempting to make the left turn onto Coteau Road, Mr. Danos stopped his vehicle in the neutral area of the intersection before proceeding across the eastbound lanes of Prospect Avenue onto Coteau Road. While stopped in the neutral area, a white vehicle travelling in the opposite direction on Prospect Avenue was also attempting to make a left turn onto Coteau Road. The white vehicle stopped in the inside lane of Prospect Avenue. As both vehicles were stopped at the intersection, the driver of the white vehicle made a waving gesture to Mr. Danos, who then proceeded forward across Prospect Avenue and was struck by a vehicle driven by Mr. Duplantis, who was travelling east on Prospect Avenue in the outside lane.
Plaintiff, individually and as natural tutrix of the minor child, Jacob Duplantis, filed suit against Mr. Danos, Allstate Insurance Co., and DOTD. Plaintiff settled her portion of the case with Danos and Allstate.
After trial held on October 18, 1994, the court found DOTD to be 30% at fault, Mr. Danos to be 60% at fault, and the driver of the unidentified white vehicle to be 10% at fault. Additionally, the trial court found that DOTD was solidarily liable with the driver of the unidentified white vehicle, and DOTD was cast to pay 40% of the total judgment.
Plaintiff was awarded $605,585.00 for her damages and $175,000.00 for damages as natural tutrix for Jacob. With DOTD given 60% "credit" (for the percentage of fault attributable to the released Mr. Danos), the *1386 judgment against DOTD amounted to $242,274.00[3] for plaintiff, individually, and $70,000.00 for plaintiff as tutrix of Jacob.
DOTD has appealed, alleging the following assignments of error for our review:

1.
The trial court erred in not finding Belve P. Danos solely responsible for the accident in question.

2.
The trial court erred in finding negligence on the part of DOTD.

3.
The trial court erred in finding that DOTD was solidarily liable with the driver of the unknown white car.
Plaintiff filed an answer to this appeal, and alleged the following assignments of error:

1.
The trial court committed manifest error in only assessing 30% fault to DOTD, and in assessing 60% fault to Belve Danos.

2.
The trial court committed manifest error in only awarding the sum of $350,000.00 for loss of support.[4]

FAULT OF THE PARTIES

(DOTD'S ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO)

DOTD
DOTD contends that the trial court erred in finding it liable to plaintiff under a theory of negligence.[5]
Under a theory of negligence, liability hinges on whether the defendant has breached his duty to the plaintiff. Briggs v. Hartford Ins. Co., 532 So.2d 1154 (La.1988). DOTD's duty to travelers is to keep the state's highways in a reasonably safe condition. LeBlanc v. State, 419 So.2d 853 (La. 1982); Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). Whether DOTD breached its duty, that is, whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of each case. Hunter v. Department of Transportation and Development, 620 So.2d 1149, 1151 (La.1993).
For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable *1387 evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.
Plaintiff alleged that the intersection where the accident occurred was unreasonably dangerous because there was no traffic signal and because there were no left turn lanes.
Prospect Avenue is a four lane divided highway which runs in a north-south direction and is posted with a 50 mile per hour speed limit. Prospect Avenue extends from LA 24, at Bayou Terrebonne, northward to its intersection with LA 316, and carries traffic from the outskirts of the Houma area towards New Orleans, as well as commuter and industrial traffic in the area. Prospect Avenue crosses the Intercoastal Waterway Bridge just south of the intersection in question. Prospect Avenue has a 22 foot wide grass median, and on the date this accident occurred, had a yellow caution light for the traffic travelling on Prospect Avenue.
Coteau Road is a two lane undivided rural collector route which runs in an east-west direction and serves as a bypass on the north side of the Houma urbanized area. It serves several industrial areas of principal traffic generation and connects feeder routes into Houma, including Prospect Avenue, US 90, and the LA 24 Couplet System. Coteau Road is posted with a 45 mile per hour speed limit. On the date of the accident, there was a flashing red beacon for the traffic travelling on Coteau Road.
At trial, plaintiff presented the testimony of Stephen Strenvth, who was the District Traffic Operations Engineer in District 2 for DOTD. Mr. Strenvth also produced records maintained by DOTD on this particular intersection. Mr. Strenvth testified that the Prospect Avenue bridge and its extension were opened in 1980. Mr. Strenvth testified that the original plans did not include left lane construction at this intersection and believed that there was no data present to justify a left turn lane at the time the intersection was designed. It was the opinion of Mr. Strenvth that, when there are significant turning volumes, left turn lanes should be provided.
Mr. Strenvth testified that studies, normally referred to as traffic warrants, are undertaken at particular intersections based upon a system which identifies abnormal accident locations, or upon request from the public, elected officials, etc.
The DOTD records produced by Mr. Strenvth indicated that the Terrebonne Parish Police Jury requested an investigation into the feasibility of installing a traffic light at the intersection of Coteau Road and Prospect Avenue on July 15, 1983. The request by the Terrebonne Parish Police Jury noted that the items contributing to the dangerousness of the intersection were the ever-increasing number of motorists in the area, and the small, inadequate turning lanes on Prospect Avenue.[6]
In response to this request, DOTD issued a report dated February 23, 1984, which stated that it had performed several engineering studies, and, based upon the results of these studies, DOTD concluded that none of the traffic signal warrants were met.[7] DOTD's report further stated that engineering observations of the intersection and test runs through the location confirmed the study results, namely that congestion and delay were minimal and that the intersection geometrics were conducive to safe traffic flow for the motoring public. The report recommended that the request for signalization be denied. Mr. Strenvth observed that *1388 the only reference to turning lanes in this report was the mention of "intersection geometrics."
On February 11, 1988, the Terrebonne Parish Police Jury adopted a resolution again requesting that a traffic light be installed at this intersection. The Resolution referred to numerous traffic accidents and noted that "due to the good condition of the Coteau Road many motorists travel on this roadway and are unaware of the upcoming intersection with Prospect Street."
DOTD again denied the Police Jury's request for a traffic signal at this intersection. The letter from DOTD to the Police Jury indicated that DOTD's report advised that a traffic signal survey was taken at this intersection. This survey revealed that traffic volumes, accident data, and other conditions failed to demonstrate a need for traffic signal control at that time.
Mr. Strenvth stated that, among other things, the survey revealed that only one accident had occurred at this intersection from July 1, 1986, through July 1, 1987. The survey also established that traffic flowed well because over 80% of the major side street vehicles were turning right, and the installation of a traffic signal would not have an appreciable effect on the operation of right turns. The survey also noted that speeds were reasonably close to the posted speed limit.
DOTD records also contained a traffic signal warrant analysis dated December 12, 1990, but Mr. Strenvth was unable to ascertain at whose request this analysis was done. However, the report recommended that a fully actuated isolated signal be placed at this intersection. Mr. Strenvth also observed that the report contained information indicating that the placement of a left turn lane in the northbound direction (the lane in which the unidentified white car was located) would not result in a loss of efficiency at the intersection. There was no evidence that a field review was done at this time.
There were several requests made for a traffic signal to be placed at this intersection in DOTD's records, including several letters from various federal and state elected officials. DOTD records also contained a petition dated October 9, 1992, submitted by Peggy Guidroz, that was signed by approximately 700 people.
Mr. Strenvth testified that, as a result of these requests, he wrote a report based upon his re-evaluation of the data collected in 1990 and a field review of the traffic conditions. This report, dated January 11, 1993, recommended that a three phase, fully actuated traffic signal be installed at this intersection. The report also recommended that the signal light include a protected left turn phase operating in the protected-permitted mode for south approach left turns at the intersection, due to the heavy left turn volumes. The report further recommended that left turn lanes be constructed on the north and south approaches to the intersection, at which time a left turn indication can also be added for the north approach.
Mr. Strenvth testified that although the 1990 data was used, the field review was the significant factor in making the decision to install the signal. Mr. Strenvth observed that, during a field review, they would look for factors that may explain the occurrence of accidents, congestion, etc. According to Mr. Strenvth's report, the field review conducted in 1990 indicated the following:
during peak hours of traffic operations ... vehicles on LA 660 [Coteau Road] experienced excessive delay during peak hours even though most of these vehicles turned right at the intersection from the west approach. Vehicles crossing and turning also had difficulty due to the width of the main highway as well as heavy traffic volumes on Prospect Avenue. The heavy left turning volume from the Prospect south approach into LA 660 experienced moderate delays in making their maneuvers but also caused substantial delay during periods of heaviest volumes of the through traffic on the south approach of Prospect Avenue.
Mr. Strenvth testified that political pressure was a major factor in the decision to *1389 install a traffic signal at this intersection, although he noted that the data from the warrant analysis performed in 1990 would support this decision. Although Mr. Strenvth testified that the normal delay time in installing a traffic signal was about three to four years, the traffic signal was installed at this intersection on March 18, 1992, approximately three months after his recommendation and one month after the accident. Mr. Strenvth also noted that the recommended turning lanes had not yet been installed at this intersection.
Emmett Robichaux testified that he lived near the intersection and travelled through the intersection several times a day. Mr. Robichaux testified that he complained to DOTD about the intersection because of the many accidents which occurred there. Mr. Robichaux noted that it seemed like traffic coming off of the bridge had no inclination to stop or slow down, even when trying to make a left turn onto Coteau Road. Mr. Robichaux stated that it seemed like people took undue chances because it was difficult to traverse the intersection. Mr. Robichaux also stated that, after the traffic signal was installed, the problems got worse, apparently because people were ignoring the signal.
Trooper Falcon investigated the accident in question. Trooper Falcon stated that Mr. Danos told him that a driver of a white vehicle approaching from the Prospect Avenue bridge was attempting to make a left turn and had signalled him to go. Mr. Danos did not tell Trooper Falcon that there were any obstructions to his vision.
Peggy Guidroz lived near this intersection and travelled through it often. Ms. Guidroz testified that she drew up a petition for submittal to DOTD about the dangerousness of this intersection after her daughter had been in an accident there in April of 1992.
James R. Clary, Sr., was called by plaintiff as an expert in traffic engineering. Mr. Clary testified that he could find nothing which would prevent the construction of turning lanes at this intersection. Mr. Clary also testified that turning lanes would give the left turning motorist a better angle to view oncoming traffic before making a left turn. Mr. Clary thought that, with the introduction of left turn lanes, Danos would have been able to see oncoming traffic. Mr. Clary also stated that the addition of a traffic signal would have reduced the likelihood of the occurrence of this accident to "almost nothing" because people would have been turning in a protected mode.
David Blaschke testified for DOTD as an expert in highway design and traffic engineering. Mr. Blaschke found no requirement for left turn lanes at this intersection. Mr. Blashchke testified that left turn lanes are helpful when volumes become more frequent and the occurrence of rear end collisions increases. Mr. Blaschke did not think that the presence of a left turn lane would have changed the outcome of this accident because the drivers would have just been shifted over to other lanes. Mr. Blaschke also looked at the 1990 warrant analysis and stated that the warrants supported the installation of a traffic signal, but also noted that the installation of signalization was almost always discretionary. Mr. Blaschke did not believe that left turn lanes were necessary. Mr. Blaschke stated that left turn lanes are warranted based upon the frequency of rear end collisions, and he had seen no indication of these types of collisions at this intersection.
Based upon the evidence before us, we find no manifest error in the trial court's finding that this intersection was unreasonably dangerous. Thus, the finding of fault on the part of DOTD is correct.

MR. DANOS
DOTD also contends that Mr. Danos was at fault in making his left turn under the circumstances.
A left turn is generally a dangerous maneuver which must not be undertaken until the turning motorist ascertains that the turn can be made in safety. Kaplan v. Insured Lloyds Insurance Company, 479 So.2d *1390 961, 964 (La.App. 3rd Cir.1985); Agency Rent-A-Car, Inc. v. Hamm, 401 So.2d 1259 (La.App. 1st Cir.1981). A high degree of care is required of a left-turning motorist. A left-turning motorist involved in an accident is burdened with a presumption of liability, and the motorist must show that he is free of negligence. Kaplan v. Insured Lloyds Insurance Company, 479 So.2d at 964; Bennett v. United States Fidelity & Guaranty Company, 373 So.2d 1362, 1365 (La.App. 1st Cir.), writ denied, 376 So.2d 1269 (La.1979).
In the present case, Mr. Danos failed to exercise the high degree of care which the law requires of a left-turning motorist. Mr. Danos testified that he pulled into the median in order to make his left turn onto Coteau Road. Mr. Danos stated that, while he was in the median, an unidentified white vehicle, travelling in the opposite direction on Prospect Avenue, stopped in the inside lane of Prospect Avenue. Mr. Danos also stated that there was another vehicle behind the white car. Mr. Danos testified that the presence of these two vehicles, along with signs located on the median, made it difficult for him to see any oncoming traffic in the outside lane of traffic. Mr. Danos stated that the driver of the white car looked into her rearview mirror, and her side mirror, and then flagged him to proceed. Mr. Danos stated that he then proceeded slowly across Prospect Avenue and was hit by Duplantis' vehicle. Mr. Danos testified that he never saw the Duplantis vehicle before the collision occurred.
Trooper Ralph Mitchell took photographs of the accident scene on the date the accident occurred, which illustrated that there were no signs that could have blocked Mr. Danos' vision in the median. Trooper Mitchell also looked at the tires on Mr. Danos' truck and observed that his truck would have sat higher than the vehicles around it.
Andrea Matherne was travelling on Coteau Road and had stopped at the intersection shortly before the accident occurred. Ms. Matherne testified that she observed both the Danos vehicle and the unidentified white vehicle. Ms. Matherne also testified that she saw the driver of the white vehicle wave to Mr. Danos to proceed, and then he just took off.
Based upon this evidence, Mr. Danos' actions were a breach of his duty as a motorist. Thus, the trial court did not err in finding Mr. Danos to be at fault.

QUANTIFICATION OF FAULT

(DOTD'S ASSIGNMENT OF ERROR NUMBER THREE PLAINTIFF'S ASSIGNMENT OF ERROR NUMBER ONE)
Through Assignment of Error Number Three, DOTD contends that the trial court erred in finding it to be solidarily liable with the unidentified driver of the white vehicle. Plaintiff contends that the trial court erred in its assessment of fault. Specifically, plaintiff argues that the assessment of fault to DOTD should be increased to 50%.
We initially note that the trial court erred in assessing 10% fault to the unidentified driver of the white vehicle. In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496, p. 10 (La. 6/30/95); 657 So.2d 975, 982, the Louisiana Supreme Court concluded that the quantification of fault of a person that no party sees fit to join in the suit as a defendant or a third party defendant is not required unless there is a compelling reason, such as in the case of a settling tortfeasor or a non-party whose negligence is imputable to a party.[8]
Because the trial court erred in assigning fault to the unknown driver of the white car, that percentage of fault must be disregarded. Cavalier v. Cain's Hydrostatic Testing, Inc., 657 So.2d at 984; Guidry v. Frank Guidry Oil Co., 579 So.2d 947, 954 (La.1991). Therefore, this court must first determine if the *1391 degrees of fault assessed to the two remaining tortfeasors, Danos and DOTD, are correct. This court must then apportion the total fault between Danos and DOTD using a ratio approach. See Guidry v. Frank Guidry Oil Co., 579 So.2d at 954, and the authorities cited therein.
It is well settled that the allocation of comparative negligence is a factual matter within the sound discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 839-840 (La.App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).
The Louisiana Supreme Court, in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), set forth the guidelines for apportioning fault under the doctrine of comparative negligence. The court, quoting § 2(b) of the Uniform Comparative Fault Act, stated the following:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, the court listed various factors which may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty and Insurance Co., 469 So.2d at 974.
The conduct of Danos, in blindly proceeding to make a left turn across this intersection, was clearly the result of inadvertence on his part. On the other hand, DOTD's negligence involved an awareness of the danger presented by the intersection.
After considering the evidence and the Watson factors, we conclude that the trial court's apportionment of 30% fault to DOTD and 60% fault to Danos was not manifestly erroneous. Therefore, using the ratio approach, the 10% of fault erroneously assessed to the unidentified driver of the white vehicle is to be reassessed as follows: 6.67% to Danos and 3.33% to DOTD.

DAMAGESLOSS OF SUPPORT

(PLAINTIFF'S ASSIGNMENT OF ERROR NUMBER TWO)
Plaintiff complains that the trial court erred in only awarding the sum of $350,000.00 for loss of support.
The elements of damage for a wrongful death action include loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. Cannon v. Cavalier Corp., 572 So.2d 299, 307 (La.App. 2nd Cir.1990).
In this case, plaintiff submitted the report of Dr. Randolph Rice, who estimated the loss of support to the Duplantis family to be $429,645.00. In reaching this estimate, Dr. Rice calculated that David Duplantis had a work-life expectancy of 35.25 years. Dr. Rice also calculated David Duplantis' average annual earnings to be $19,620.17. Dr. Rice concluded that Mr. Duplantis' past wage losses were $33,489.00 (representing what he might have earned from the date of his death until the date of trial). In determining Mr. Duplantis' future earning capacity, Dr. Rice applied an average annual rate of growth of 5.5%, beginning with his base income. Dr. Rice then applied a discount rate of 7.25% and calculated the discounted/present value of Mr. Duplantis' future earning capacity to be $520,506.00. Dr. Rice then deducted an average number representing Mr. Duplantis' personal consumption expenditures and concluded that the total loss of support (past and future) equalled $429,645.00.
DOTD submitted a report prepared by Dan Cliffe, a certified public accountant. *1392 Mr. Cliffe determined as of October 17, 1994, Mr. Duplantis had a work-life expectancy of 34.66 years. Mr. Cliffe estimated Mr. Duplantis' annual income rate to be $19,230.17. Mr. Cliffe stated that the rate of annual income would increase steadily at either 2% or 5%, depending upon several factors. Mr. Cliffe also used a pretax discount rate of 7.60%, based on the returns currently available in risk-free investments. Mr. Cliffe also estimated the consumption of family income by Mr. Duplantis to be between 31% and 35%. Mr. Cliffe gave a range of figures to be considered, depending upon the occurrence of certain conditions. Mr. Cliffe stated that the midpoint ranges could be taken as the best estimates. The midpoint range for future loss of support, based on pretax income and regular worklife for spouse and children to age 21, was $244,995.29, and the past loss of support was $22,659.99. The midpoint range for future loss of support, based on aftertax income and regular worklife for spouse and children to age 21, was $219,014.96, and the past loss of support was $19,673.09.
After a review of the evidence, we cannot say that the trial court abused its discretion in its award of $350,000.00 for loss of support. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court, finding the unidentified white vehicle to be 10% at fault, is reversed. The judgment of the trial court is amended as follows:
IT IS ORDERED, ADJUDGED AND DECREED that the defendant, State of Louisiana, through the Department of Transportation and Development, is hereby found to be 33.33% at fault, and that Belve Danos is hereby found to be 66.67% at fault.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant, State of Louisiana, through the Department of Transportation and Development, is hereby given a credit of 66.67% of the damages suffered by plaintiff in accord with Articles 2324 and 1803 of the Louisiana Civil Code.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Leslie B. Duplantis, individually, and against the defendant, State of Louisiana, through the Department of Transportation and Development, in the sum of TWO HUNDRED ONE THOUSAND, EIGHT HUNDRED FOURTY ONE AND 48/100 ($201,841.48) DOLLARS, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Leslie B. Duplantis, as the Natural Tutrix of the Minor Child, Jacob Ryan Duplantis, and against the defendant, State of Louisiana, through the Department of Transportation and Development, in the sum of FIFTY EIGHT THOUSAND, THREE HUNDRED TWENTY SEVEN AND 50/100 ($58,327.50) DOLLARS, together with legal interest thereon from date of judicial demand until paid.
In all other respects, the judgment of the trial court is affirmed. Costs of this appeal, in the amount of $2,058.00, are to be divided equally between plaintiff and DOTD.
REVERSED IN PART; AND, AS AMENDED, AFFIRMED IN PART.
NOTES
[1] Judge Hillary Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] We note that the records from DOTD on this intersection indicate that Prospect Avenue runs in a north-south direction.
[3] Although the judgment reflects that the amount of damages attributable to DOTD after the credit was $242,274.00, it appears that there was an error in the mathematical calculation; forty (40) percent of $605,585.00 is $242,234.00.
[4] The record indicates that plaintiff also filed a motion and order for a devolutive appeal.
[5] Although plaintiff alleged that DOTD was liable under both negligence and strict liability theories, the trial court found that DOTD was not strictly liable to plaintiff. No party has questioned this finding on appeal.
[6] DOTD records also revealed a request for a traffic light at this intersection from several citizens in 1983.
[7] The studies conducted included (1) a 24-hour recorder count; (2) a peak hour turning movement count; (3) a spot speed study; and (4) a 12-month collision diagram.
[8] In reaching this conclusion, the Louisiana Supreme Court expressly overruled its holding in Gauthier v. O'Brien, 618 So.2d 825 (La.1993), that quantification of employer fault either is suggested by LSA-C.C.P. art. 1812 C or is made mandatory by LSA-C.C. art. 2324 B.