THERIOT, J.
1 gIn this case involving an automobile accident between an on-duty police officer and another driver, the defendant police department appeals a trial court judgment rendered in accordance with a jury verdict finding it at fault and awarding damages to plaintiffs, as well as the trial court judgment denying defendant’s motion for judgment notwithstanding the verdict. Plaintiffs answered the appeal. We amend the judgment to reduce the survival damages award to the statutory cap of $500,000.00, and as amended, affirm.
FACTS AND PROCEDURAL HISTORY
This suit arises from an accident which occurred on February 2, 2008 on Airline Highway in Baton Rouge, Louisiana between an on-duty Baton Rouge Police Department (“BRPD”) officer, Stephen C. Tibbetts, and plaintiff, Nelson Dakmak, Sr. On the night of the accident, just prior to *503 10:40 p.m., Officer Tibbetts was patrolling the area of Airline Highway when he saw a vehicle traveling north on Airline Highway which matched the description of a stolen vehicle. He pulled out onto Airline Highway and attempted to catch up with the • vehicle in order to determine if it was in fact the stolen vehicle. He did not activate his lights or sirens, but floored the accelerator, eventually reaching a speed of 92 miles per hour.[1] At this time, Mr. Dak-mak was traveling south on Airline Highway. When Mr. -Dakmak attempted to turn left onto Delcourt Street from Airline Highway, his vehiclé was struck by Officer Tibbetts’ oncoming vehicle. Mr. Dakmak, who was 83 years old at the time of the accident, was paralyzed from the waist down as a result of the accident. While hospitalized for his injuries after the 1 ¡¡accident, Mr. Dakmak was diagnosed with hepatocellular carcinoma, a type of liver cancer. Mr. Dakmak died on April 30, 2008.
Just prior to his death, Mr. Dakmak filed suit for damages arising from the accident, naming Officer Tibbetts and BRPD as defendants. Following his death, the suit was amended to substitute his sons, John Mark Dakmak, individually and as the succession representative of the Estate of Nelson Dakmak, Sr., William Joseph Dakmak, and Nelson Dakmak, Jr., as plaintiffs. Additionally, the petition was amended to include an allegation that Mr. Dakmak’s death was caused by the accident and to assert a claim for - wrongful death.
After a jury trial, the jury rendered a verdict finding that Officer Tibbetts was negligent in causing the accident and that Mr. Dakmak was not negligent. The jury also found that Officer Tibbetts’ negligence caused Mr. Dakmak’s injuries, including his death. The jury awarded $1,000,000.00 for Mr. Dakmak’s injuries ánd $10,000.00 for each of his three sons’ wrongful death claims. Officer Tibbetts and BRPD filed a motion for JNOV, which was denied, and this appeal followed.
On appeal, BRPD assigns as error the jury’s apportionment of fault, its finding that Mr. Dakmak’s death was caused by the accident, the amount of damages awarded, and the trial court’s denial of JNOV. Plaintiffs answered the appeal, arguing that the $10,000.00 award to each of Mr. Dakmak’s grown children for his wrongful death was abusively low, that the court erred in refusing to allow testimony regarding Mr. Dakmak’s medical bills, and that the court erred in refusing to allow a proffer of certain uncertified medical bills.
| .DISCUSSION

Allocation of Fault

BRPD argues on appeal that some degree of fault should have been assigned to Mr. Dakmak because he failed to ascertain in advance that the way was clear before turning left in front of an oncoming vehicle. The allocation of fault between comparatively negligent parties is a finding of fact. Sims v. State Farm Auto. Ins. Co., 98-1613, p. 2 (La.3/2/99), 731 So.2d 197, 199. In apportioning fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Gibson v. State Through Dept, of Transp. and Development, 95-1418, p. 12 (La.App. 1 Cir. 4/4/96), 674 So.2d 996, 1005, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373-74 (citing Campbell v. Louisiana Dept, of Transp. and Development, 94-1052, p. 7 (La.1/17/95), 648 So.2d 898, 902). We re *504 view a fact finder’s apportionment of fault under the manifest error-clearly wrong standard of review. Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610.
A left turn is generally a dangerous maneuver which must not be undertaken until the turning motorist ascertains that the turn can be made in safety. Duplantis v. Danos, 95-0545, p. 10 (La. App. 1 Cir. 12/15/95), 664 So.2d 1383,1389. A high degree of care is required of a left-turning motorist. A left-turning motorist involved in an accident is burdened with a presumption of liability, and the motorist must show that he is free of negligence. Id. at p. 10, 664 So.2d at 1390. An oncoming motorist has a right to assume that a left-turning motorist will yield the right-of-way. Anderson v. May, 01-1031, p. 5 (La.App. 5 Cir. 2/13/02), 812 So.2d 81, 85. Nevertheless, the favored driver can still be found negligent if his or her ^substandard conduct contributed to the cause of the accident. For instance, a motorist making a left turn at an intersection will be held free of negligence when the collision results because of the oncoming vehicle’s excessive speed which he could not reasonably anticipate. Id. Left-turning drivers will be held free of negligence if they have made the proper signal and commenced the turn upon a reasonable belief, after observing approaching traffic, that the turn would not unduly interfere with the progress of approaching traffic, or where the sole proximate cause of the accident was excessive speed, lack of lookout, or lack of control on the part of the approaching vehicle in failing to observe a reasonably-signaled left turn intent and continuing to approach without attempting to bring the vehicle under control. Id. at pp. 5-6, 812 So.2d at 85.
Officer Tibbetts testified that while on patrol on the night of the accident, he floored the accelerator of his police vehicle in an attempt to “catch up” to a suspicious vehicle. In doing so, he increased his speed to 92 miles per hour.[2] Officer Tib-betts testified that he was not paying attention to his speed; he was just focused on his surroundings and keeping an eye on the tail lights of the suspect vehicle in front of him. As soon as he saw Mr. Dakmak’s vehicle begin to turn left in front of him,[3] he veered towards the shoulder and braked, but was unable to avoid the collision. According to the black box data retrieved from the police vehicle, Officer Tibbetts let off the gas 3.5 seconds before the crash, but despite braking was still traveling 59 miles per hour when he struck Mr. Dakmak’s vehicle.
| (¡Officer Tibbetts testified that he did not turn on his police lights or siren while attempting to catch up to the suspicious vehicle because he believed he was only required to do so if he was “in pursuit” of a suspect. Despite the fact that it was dark at the time of the accident, he did not think that it was unsafe for him to be traveling at such a high rate of speed without flashing lights or sirens because the traffic was light at that time of night. However, he admitted at trial that he failed to take into account the possibility that an oncoming vehicle would make a left turn. Officer Tibbetts also testified that he had been involved in thirteen other accidents as a police officer, but had never *505 received a citation or reprimand for any of them.
Although La. R.S. 32:24 provides that the driver of an emergency vehicle may exceed the speed limit when in pursuit of an actual or suspected violator of the law as long as he does not endanger life or property, this exception only applies when the vehicle is making use of audible and visual signals sufficient to warn motorists of its approach. Furthermore, La. R.S. 82:24 does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons, nor does it protect the driver from the consequences of his reckless disregard for the safety of others. La. R.S. 32:24(D).
Plaintiffs’ expert accident reconstruc-tionist, James Lock, estimated that Officer Tibbetts’ vehicle was 585 feet away when Mr. Dakmak began his left turn. He explained that when it is dark outside, it is very difficult for a driver to determine how fast an approaching vehicle is traveling, and while there is an expectation that some drivers may be going 10 miles or so over the speed limit, there is no reasonable expectation that an oncoming vehicle will be traveling at almost twice the speed limit. Mr. Lock noted that even if | yOfficer Tibbetts had been going as fast as 70-80 miles per hour, Mr. Dakmak could have completed his turn safely and the crash could have been avoided. He concluded that without any type of warning from the oncoming vehicle, such as police lights, sirens, or flashing headlights, Mr. Dakmak was reasonably prudent in making a left turn based upon what he was able to observe at the time he began his turn.
Although BRPD offered the testimony of its own expert accident recon-struetionist that Mr. Dakmak could have avoided the accident- by slamming on the brakes once he realized how fast Officer Tibbetts was traveling, the jury is free to accept or reject in whole or in part any opinion expressed by an expert. The effect and weight to be given to expert testimony is within the jury’s broad discretion. The jury may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the jury’s opinion, such substitution appears warranted by the evidence as a whole. This decision will not be disturbed on appeal absent a finding that the jury abused its broad discretion. Morgan v. State Farm Fire & Cas. Co., Inc., 07-0334, pp. 8-9 (La.App. 1 Cir. 11/2/07), 978 So.2d 941, 946.
In apportioning all fault to BRPD, the jury obviously concluded from the evidence before it that the sole proximate cause of the accident was Officer Tibbetts’ excessive speed, which could not have been reasonably anticipated by Mr. Dakmak. Based upon our review of the evidence before the jury, we do not find that the jury was clearly wrong in apportioning all fault in the accident to Officer Tibbetts. This assignment of error is without merit.

]£!ausation

BRPD next argues that the jury erred in finding that the accident caused Mr. Dakmak’s death. The burden is on the plaintiffs to prove, by a preponderance of the evidence, the existence of the claimed injuries and a causal connection between the injuries and the accident. See Yohn v. Brandon, 01-1896, p. 6 (La.App. 1 Cir. 9/27/02), 835 So.2d 580, 584, writ denied, 02-2592 (La.12/13/02), 831 So.2d 989. The test to determine if that burden has been met is whether the plaintiffs proved through medical testimony that it is more probable than not that the injuries were caused by the accident. Id.
*506 Generally, the effect and weight to be given to medical expert testimony is within the broad discretion of the fact finder. Yohn, 01-1896 at p. 7, 835 So.2d at 584. The law is well settled that where the testimony of expert witnesses differs, the trier of fact has great, even vast, discretion in determining the credibility of the evidence, and a finding in this regard will not be overturned unless it is clearly wrong. Cotton v. State Farm Mut. Auto. Ins. Co., 10-1609, pp. 7-8 (La.App. 1 Cir. 5/6/11), 65 So.3d 213, 220, writ denied, 11-1084 (La.9/2/11), 68 So.3d 522.
Plaintiffs offered the testimony of Dr. Conrad de Los Santos, an expert in emergency medicine and family medicine, regarding the cause of Mr. Dakmak’s death. Dr. de Los Santos testified that although Mr. Dakmak suffered from a number of medical conditions prior to the accident, including diabetes, hypertension, and a history of prostate cancer (which was considered cured), none of those conditions were life-threatening. According to Dr. de Los. Santos, the main injury suffered by Mr. Dakmak in the accident, a severed spinal cord, has a high mortality rate: seventy percent of patients who suffer this type of injury die within the first twenty-[four9 hours. Furthermore, paraplegic patients typically develop processes that ultimately kill them, most frequently decubitus ulcers which become infected and lead to their death. This was the case with Mr. Dakmak; he developed a grapefruit-sized stage 3 decubitus ulcer on his sacrum, meaning that the ulcer had eaten through the skin, through the muscle, and down to the bone. Dr. de Los Santos concluded from his review of the medical records that Mr. Dakmak died from the injuries he sustained in the accident, specifically, the wounds on his body (the ulcers) as well as from complications from bleeding due to the blood thinners he was given after the accident.
BRPD alleged that the jury erred in finding that Mr. Dakmak’s death was caused by the accident because he was diagnosed with inoperable liver cancer based upon a biopsy performed shortly after his accident and because his death certificate lists “carcinomatosis” (widespread cancer) as his cause of death. However, Dr. Shannon Cooper, the East Baton Rouge Parish Coroner who prepared Mr. Dakmak’s death certificate, testified that when a patient dies while under hospice care (as Mr. Dakmak did), he receives the notice of death, which includes the cause of death, from the hospice nurse. He did not examine Mr. Dakmak or review his medical records in order to verify the cause of death provided to him by the hospice nurse; the sole information he used to prepare the death certificate was the death notice faxed to him by hospice which listed liver cancer and prostate cancer as the cause of death. Dr. Cooper also testified that if he had been aware of the fact that Mr. Dakmak had recently been involved in a motor vehicle accident which rendered him a paraplegic, that he had a stage 3 decubitus ulcer days before his death, that his prostate cancer was considered cured, or that an “eminent pathologist” disagreed with the liver cancer diagnosis, it would Imhave caused him to question the cause of death supplied by the hospice nurse.
Dr. de Los Santos disagreed with BRPD’s assertion that Mr. Dakmak died of liver cancer because other signs of liver cancer were absent: Mr. Dakmak’s liver enzymes were not elevated, there was no positive A.F.P. marker, his liver was not enlarged, he was not ascitic, and he was not jaundiced. However, Dr. de Los Santos testified that even if Mr. Dakmak did *507 have liver cancer, the accident was the main and probably only factor in his death.
In further support of their assertion that Mr. Dakmak did not have liver cancer, plaintiffs offered the testimony of Dr. Nir-ag Jhala, an expert in pathology, cytopa-thology, and gastrointestinal tract pathology. Dr. Jhala testified that hepatocellular carcinoma is particularly difficult to diagnose from a liver biopsy slide, and falls within the specialty of GI tract pathology, an area in which he has both taught and worked for more than ten years. He conducted a blind review of the slides from Mr. Dakmak’s liver biopsy after his death, and although he did see the abnormal area on the slide, he concluded that it was highly unlikely that Mr. Dakmak had cancer. He explained that although liver cancer is among the range of differential diagnoses for a liver mass, there were several other findings which made this diagnosis less likely for Mr. Dakmak, and he was able to conclude, “[a]s certain as one can be in the field of medicine,” that Mr. Dak-mak did not have hepatocellular carcinoma.
Although BRPD presented expert testimony that conflicted with the conclusions of the plaintiffs’ experts, it is clear that the jury chose to accept the opinions of plaintiffs’ experts over those of BRPD’s experts. This choice is within the discretion of the trier of fact, and based on our review of |nthe record, we cannot say ⅝ was clearly wrong. This assignment of error is without merit.

Quantum

In their next assignment of error, BRPD argues that the awards for Mr. Dakmak’s injuries are excessive given the duration of his suffering and the evidence presented. The jury awarded $834,000.00 for Mr. Dakmak’s past physical pain and suffering, $333,000.00 for his past mental pain and suffering, and $333,000.00 for his loss of enjoyment of life. Mr. Dakmak lived less than three months from the date of the accident.
The factors to be considered in assessing quantum for pain and suffering are severity and duration. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1 Cir. 11/10/94), 647 So.2d 351, 357. It is well settled that a judge or jury is given great discretion in its assessment of quantum, for both general and special damages. Guillory v. Lee, 09-0075, p. 14 (La.6/26/09), 16.So.3d 1104, 1116. Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact that is entitled to great deference on review. Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. As such, the role of an appellate court in reviewing an award of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award of general damages on review. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The initial inquiry must always be directed at whether the trial court’s award for the particular injuries and their effects upon this particular injured person is a 112clear abuse of the trier of fact’s much discretion. Thibodeaux, 93-2238 at p. 8 (La.App. 1 Cir. 11/10/94), 647 So.2d at 357. In reviewing an award of damages, an appellate court should not rely on a comparison of other awards in other cases to determine if a particular award is appropriate. A comparative analysis should be undertaken only after the appellate court has found an abuse of discretion. Id. at pp. 8-9, 647 So.2d at 357.
*508 Mr. Dakmak’s back was broken in the accident, severing his spinal cord completely. He suffered T-8 paraplegia, meaning he was paralyzed from the umbilicus down. Additionally, he suffered a C-6 fracture, a left ankle fracture, lung contusions, and other non-life-threatening injuries. Due to his paralysis, Mr. Dakmak did not feel any pain from the ankle fracture or the surgery to repair it. However, the plaintiffs’ expert, Dr. de Los Santos, explained that the neck and back pain he endured would have been “excruciating.” Additionally, as a consequence of his paralysis, Mr. Dakmak developed a number of decubitus ulcers, the worst of which was a grapefruit-sized stage three ulcer on his sacrum with exposed bone. Mr. Dakmak was still experiencing neck pain shortly before his death and was on pain medication for his injuries up until the time of his death.
By all accounts, Mr. Dakmak enjoyed an active social life up until the time of his accident. He lived independently, drove himself around, dined in restaurants, and visited friends frequently. Immediately after the accident, Mr. Dakmak was hopeful that he could recover; however, once he was told that he would never walk again, he became acutely depressed and refused further medical intervention. Dr. Roy Ka-dair, who had been Mr. Dakmak’s primary care physician since 1987, testified that when he told Mr. Dakmak that he would not be able to walk again, Mr. Dakmak put a pillow over his head and refused to talk any more that day and afterwards just seemed toj^give up. ■ John Mark Dakmak testified that prior to the accident, his father would call him weekly, but once he learned he would not walk again, his father seemed to give up and only called him a couple of times from the nursing home before his death. Mr. Dakmak was never able to return to his home after the accident.
Given the evidence before the jury regarding the excruciating pain Mr. Dak-mak’s injuries caused and the impact on his life, we do not find that the awards constitute an abuse of discretion. This assignment of error .is without merit.

Statutory Cap

BRPD also appeals the trial court’s denial of its motion for JNOV based on the fact that the general damages award exceeds the statutory cap. BRPD argues that the award must be reduced to $500,000.00 in accordance with La. R.S. 13:5106(B), which provides, in pertinent part:
(1) The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.
(2) The total liability of the state and political subdivisions for all damages for wrongful death of any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the wrongful death of that person.
The plaintiffs were awarded $1,000,000.00 for personal injuries in the survival action, and $10,000.00 each for the wrongful death of their father. This court has interpreted La. R.S. 13:5106(B) to provide one $500,000.00 cap on personal injury *509 damages (including survival actions for those | upersonal injury damages) and one $500,000.00 cap for wrongful death damages. O’Connor v. Litchfield, 03-0397, p. 18 (La.App. 1 Cir. 12/31/03), 864 So.2d 234, 246, writ not considered, 04-0655 (La.5/7/04), 872 So.2d 1069. Therefore, the trial court judgment must be amended to reduce the $1,000,000.00 judgment to plaintiffs for Mr. Dakmak’s personal injuries to $500,000.00.

Wrongful Death Award

John Mark, William, and Nelson Dak-mak, Jr. answered the appeal, arguing that the jury’s award of $10,000.00 to each of them for their father’s wrongful death constituted an abuse of discretion.
Wrongful death claims are meant to compensate the survivors designated by La. C.C. art. 2315.2 for their own injuries arising from the loss of the decedent. The elements of an award for wrongful death include loss of love, affection, companionship, and support, as well as funeral expenses. Maldonado v. Kiewit Louisiana Co., 12-1868, p. 22 (La.App. 1 Cir. 5/30/14), 152 So.3d 909, 927, 2014 WL 2450990. The discretion to award general damages vested in the trier of fact is vast. See La. C.C. art. 2324.1. Only when the award is “in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances,” should an appellate court increase or reduce the award. Youn, 623 So.2d at 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Although each of Mr. Dakmak’s sons testified as to the close relationship he enjoyed with his father prior to the accident and how the accident and his death affected him, there was also evidence presented to suggest that they did not have such a close relationship with their father. William and John Mark had lived in Houston, Texas for over twenty years, |1sand John Mark testified that he only saw his father about five times a year, typically on holidays and for weddings and funerals. Nelson, Jr. lived four blocks away from his father in Baton Rouge and drove past his house several times a day, but he did not see him every week. The sons testified that their father would call them on the phone frequently.
Francis Fair, who was a close friend of Mr. Dakmak since 1959 and who saw him frequently up until his death, described the relationship between Mr. Dakmak and his sons as “distant” and testified that Mr. Dakmak was “frequently upset because he didn’t have the closeness that he wanted to have with them. Like they didn’t have time for him.” Ms. Fair recalled a time when Mr. Dakmak was considering purchasing a house next door to his son Nelson in Baton Rouge and he became upset because his son and daughter-in-law did not want him living that close to them.
When Mr. Dakmak was hospitalized following the accident, John Mark and William waited several days before coming to Louisiana to see their father. William testified that he was told about the accident by Nelson, Jr. on the Saturday night it happened, but Sunday was the Super Bowl and he did not realize how severe his father’s injuries were, so he did not go to Louisiana immediately. John Mark testified that he waited until Monday to drive to Louisiana, and returned to Houston on Monday evening after seeing his father. When Mr. Dakmak was readmitted to the hospital from the nursing home shortly before his death, the medical records state that family could not be reached initially and “aggressive attempts” were required to locate them.
*510 Considering the evidence before the jury, we do not find that the jury abused its discretion in awarding Mr. Dakmak’s sons $10,000.00 each for the loss of their father. This assignment of error is without merit.
11 (Medical Expenses
Plaintiffs allege on appeal that the trial court erred in excluding testimony by John Mark regarding his father’s medical expenses. Rather than introducing certified copies of Mr. Dakmak’s medical bills at trial, plaintiffs attempted to have John Mark read from a handwritten list he prepared of his father’s medical and funeral expenses. BRPD objected to the testimony, and the court sustained the objection on the ground that plaintiffs did not lay the proper foundation for the witness to testify as to the amount of the bills. Plaintiffs did not attempt to lay a foundation for the testimony, but simply proffered the handwritten list prepared by John Mark at the close of trial. Plaintiffs put William on the stand and attempted to have him read from uncertified copies of the medical bills. BRPD’s attorney again objected on the grounds that the bills were not certified and were provided to her after the discovery deadline, and because the bills themselves were inadmissible, it was improper for a witness to testify as to their contents. Plaintiffs’ attorney explained to the court that he did not want to introduce the medical bills into evidence; he just wanted testimony as to their contents because he prayed for medical expenses in his petition. The court ruled that because there was no mention of the medical expenses in the pretrial order and the bills were not turned over to BRPD prior to the discovery deadline, the testimony would not be allowed. At the close of trial, plaintiffs attempted to proffer the uncertified medical bills, but the court refused the proffer because the plaintiffs never attempted to offer the bills into evidence during the trial.
A trial court has discretion in conducting a trial in an orderly, expeditious manner, and to control the proceedings so that justice is done. La. C.C.P. art. 1631(A). This discretion includes the admissibility of a |]7witness’s testimony. Pipeline Tech. VI, LLC v. Ristroph, 07-1210, p. 10 (La.App. 1 Cir. 5/2/08); 991 So.2d 1, 7, writ denied, 08-1676 (La.10/24/08); 992 So.2d 1037.
Pursuant to La. R.S. 13:3714(A), certified medical bills that are submitted to a court “shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills ... [are] sought to be used may summon and examine those making the original of the bills ... as witnesses under cross-examination.”
Plaintiffs argue.on appeal that in Webster v. Ballard, 05-2247 (La.App. 1 Cir. 3/2/07), 961 So.2d 13, this court affirmed a trial court’s ruling allowing a medical expense recapitulation to be admitted into evidence to prove the cost of treatment. However, in Webster, this court noted that the trial court’s decision to admit the evidence was ultimately a matter of the court’s discretion, and before the recapitulation was admitted into evidence, the plaintiffs established a proper foundation for admitting the bills into evidence by submitting the medical bills to prove the cost of treatment and testifying as to the treatment based on their own personal knowledge. Furthermore, the defendants were given the opportunity to cross-examine the plaintiffs. Id. at p. 6-7, 961 So.2d at 17.
In the instant case, John Mark testified that his involvement in his father’s treatment included choosing certain facilities. No additional foundation was *511 laid for the testimony before the plaintiffs’ attorney asked him to read from his list of medical expenses. When the trial court sustained BRPD’s objection on the ground that a proper foundation had not been laid for this testimony, plaintiffs’ attorney made no attempt to lay a proper foundation for the testimony and simply proffered the document. Under 11Rthese facts, we cannot say that the trial court abused its discretion in refusing to allow the testimony. This assignment of error is without merit.
Plaintiffs next argue that the trial court erred in refusing to accept their proffer of the uncertified medical bills. At the close of the trial, plaintiffs attempted to proffer Mr. Dakmak’s medical bills. The trial court refused to accept the proffer because the plaintiffs never attempted to introduce the bills at trial. In support of their argument that this was an abuse of the trial court’s discretion, plaintiffs cite La. C.C.P. art. 1636, which provides that where the court rules against the admissibility of any evidence, it shall permit the party offering it to make a complete record thereof or to make a statement setting forth the nature of the evidence. However, a review of the trial transcript reveals that the plaintiffs did not attempt to offer the uncertified medical bills into evidence; in fact, the plaintiffs’ attorney specifically told the court that he was not attempting to put the bills themselves in evidence. As such, the court did not err in refusing the proffer. This assignment of error is without merit.
DECREE
For the reasons set forth above, we amend the trial court judgment to reduce the award in the survival action from $1,000,000.00 to $500,000.00 in accordance with La. R.S. 13:5106. As amended, the trial court judgment is affirmed in its entirety. Costs of this appeal in the amount of $4,829.50 are assessed to defendant, Baton Rouge Police Department.
AMENDED AND AFFIRMED AS AMENDED.

. The posted speed limit on this part of Airline Highway was 50 miles per hour.

. Officer Tibbetts did not recall his speed on the night of the accident or even whether he was exceeding the 50 miles per hour speed limit. However, he did not dispute the data recovered from his vehicle's black box which showed that he was traveling 92 miles per hour with the accelerator floored.

. Officer Tibbetts did not recall whether Mr. Dakmak's left turn signal was on.